FILED
2010 Aug-30  PM 01:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHARON DENISE CAFFEE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Civil Action No. 2:09-CV-01027-RDP** |
| | } | |
| **MICHAEL J. ASTRUE,** | } | |
| **Commissioner, Social Security** | } | |
| **Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff Sharon Denise Caffee brings this action pursuant to Section 205(g) of the Social Security Act ("Act"), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability and Disability Insurance Benefits ("DIB"). *See* 42 U.S.C. § 405(g).  For the reasons outlined below, the court finds that the decision of the Commissioner is due to be affirmed because it is supported by substantial evidence and proper legal standards were applied.

## I.     Proceedings Below

Plaintiff filed her application for disability and DIB on February 14, 2005, alleging a disability onset date of April 21, 2004.  (Tr. 57).  Plaintiff's application was denied on August 17, 2005.  (Tr. 59-63).  On September 2, 2005, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 55).  Plaintiff's request was granted and a hearing was scheduled for January 23, 2008 before ALJ Jack F. Ostrander.  (Tr. 44-54).  The hearing was held as scheduled, but was adjourned prior to completion in order to allow Plaintiff an opportunity to submit additional

medical records from Cooper Green Hospital and to have a neuro-psychological evaluation.  (Tr. 365-72).  The hearing was rescheduled and continued on June 18, 2008.  (Tr. 36-43, 375-403).

In his August 4, 2008 decision, the ALJ determined that Plaintiff suffers from the following severe impairments:  degenerative disc disease of the cervical and lumbar spine; s/p anterior cervical diskectomy with fusion; obstructive sleep apnea; chronic obstructive pulmonary disease; obesity; depression; and anxiety.  (Tr. 22).  Although severe, the ALJ further determined that these impairments, either alone or in combination, do not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Furthermore, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to perform simple, non-complex tasks and can maintain attention and concentration in an eight-hour work-day, although she is incapable of performing past relevant work as a general manager of a fast food restaurant.  (Tr. 24-30).  The ALJ held, "[c]onsidering [Plaintiff's] age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (Tr. 31).  Ultimately, the ALJ decided that Plaintiff had not been under a disability as defined in the Act.  (*Id.*).

On August 4, 2008, Plaintiff sought review of the ALJ's decision by the Appeals Council. (Tr. 7-10).  Plaintiff's request for review was denied on March 27, 2009 (Tr. 4-6), thereby making the decision of the ALJ the final decision of the Commissioner, and thus, a proper subject of this court's review.

## II.    Facts

Plaintiff was born on December 4, 1961, and was forty-six years old at the time of the hearing.  (Tr. 85).  Plaintiff completed high school and one year of college.  (*Id*.).  Plaintiff was

2

employed by Taco Bell for eighteen years–eleven years of which she was a general manager.  (Tr. 81, 100-08, 117, 380).  Plaintiff alleges that she has been unable to engage in substantial gainful activity since April 21, 2004, due to a bulging disc in her neck, high blood pressure, ulcers, and depression.  (Tr. 80, 109-20).

Prior to her alleged onset date of disability of April 21, 2004, Plaintiff was referred to Dr. Sean O'Malley on July 26, 2002, for an evaluation of her cervical radiculopathy.  (Tr. 183).  Plaintiff reported pain in her neck, shoulder, scapula, and in her arms bilaterally, and was unaware of anything that could have caused this.  (*Id.*).  After review of an MRI, Dr. O'Malley opined that Plaintiff had a bilateral C4-5 foraminal stenosis with either osteophyte or bulging disc at the problem area.  (*Id.*).  Dr. O'Malley discussed treatment options with Plaintiff, and it was decided that she would begin physical therapy.  (*Id.*).

Over the course of the next couple of weeks, Plaintiff engaged in physical therapy as instructed by Dr. O'Malley.  (Tr. 180).  Plaintiff attended physical therapy seven times, and the physical therapy notes indicate that Plaintiff believed she was making progress. (Tr. 197).  However, Plaintiff claimed to Dr. O'Malley that the physical therapy did not help and her pain was unchanged. (Tr. 180).  As a result, Dr. O'Malley suggested that Plaintiff begin a regimen of cervical epiderals, and he informed Plaintiff that her other option was to have surgery.  (*Id.*).  Plaintiff was anxious to avoid surgery if possible.  (*Id.*).

Plaintiff saw Dr. O'Malley again on December 6, 2002, maintaining her pain complaints and stated that the three epidurals she had received were unsuccessful. (Tr. 178-79).  Dr. O'Malley noted that Plaintiff stated she had not missed work because of her problems, but because she failed to find relief through conservative methods, he went over the option of surgery again with her.  (*Id.*).  Dr.

O'Malley noted Plaintiff understood the risks and wished to proceed with surgery to correct the problem in her neck, even though there was no guarantee that surgery would completely correct her problem. (*Id.*).

Plaintiff had neck surgery on December 30, 2002. (Tr. 176-77). She was later discharged that same day, and returned to Dr. O'Malley's office on January 10, 2003, for a post-op checkup. (Tr. 175-77). Dr. O'Malley noted that Plaintiff was coping well and her wound was healing well. (*Id.*). On January 21, 2003, Plaintiff returned to Dr. O'Malley for another post-op visit where she reported that she was doing well. (Tr. 174). Dr. O'Malley recommended to Plaintiff that she refrain from wearing her neck brace to help stretch her neck muscles. It was his belief that if she regained good range of motion in her neck, her remaining pain would settle. (*Id.*). However, Plaintiff returned to Dr. O'Malley on February 4, 2003 wearing her neck brace. (Tr. 173). Dr. O'Malley documented that Plaintiff did not have the mobility as he had expected, and thus, recommended she undergo physical therapy. (*Id.*). Dr. O'Malley opined that Plaintiff was neurologically intact, and he anticipated that she would show further improvement. (*Id.*).

Plaintiff saw Dr. O'Malley on February 25, 2003. Dr. O'Malley noted Plaintiff had begun physical therapy, but prior to going, she began having recurrent neck pain and pain in her shoulders, similar to the pain she was experiencing prior to surgery. (Tr. 171). Interestingly, Plaintiff had no explanation for her pain and simply stated that it "came on out of the blue." (*Id.*). Dr. O'Malley ordered an MRI in ensure there had been no other disc rupture. (*Id.*). An MRI was conducted on February 27, 2003. The results of this MRI were compared to Plaintiff's previous MRI by Dr. Andrew Vanbergen. (Tr. 172). There was no evidence of spinal or foraminal stenosis at any level of her cervical spine, although minimal spondylosis was again visible at C4-5. (*Id.*). Dr. Vanbergen

4

also found no evidence of any abnormal enhancement on the postcontrast images. (*Id.*). When Plaintiff returned to Dr. O'Malley on March 4, 2003, Dr. O'Malley noticed no evidence of foraminal narrowing at other levels or any other abnormality at other levels. (Tr. 170). Dr. O'Malley determined it would be best to wait for improvements as Plaintiff continued to heal. (*Id.*).

On April 1, 2003, Plaintiff returned to Dr. O'Malley claiming that she was still experiencing some pain but not as bad as before, even though the symptoms were similar. (Tr. 169). Dr. O'Malley noted that although Plaintiff's exam was benign, she had not made the improvement they had hoped for. (*Id.*). Additionally, Dr. O'Malley believed Plaintiff was "o.k." and could return to work. (*Id.*).

Plaintiff returned to Dr. O'Malley on July 8, 2003, maintaining her previous pain complaints. (Tr. 167). Dr. O'Malley felt it would be "wise to arrange for a MRI to evaluate for any evidence of residual or recurrent problem." (*Id.*). Another MRI was conducted and revealed a mild Chiari I malformation with no evidence of syringohydromylia. (Tr. 168).

Plaintiff did not see Dr. O'Malley again until March 16, 2004. She still complained of pain in her neck, shoulder, and scapula. (Tr. 166). Dr. O'Malley observed that Plaintiff did not show any neurological defects, yet he ordered a MRI of her brain to further evaluate the Chiari malformation. (*Id.*). He also ordered another MRI of her cervical spine for evidence of recurrent or new disc herniation. (*Id.*). Plaintiff had both MRIs on April 14, 2004. (Tr. 164-65). Neither revealed any abnormalities other than the Chiari I malformation. (*Id.*). Plaintiff met with Dr. O'Malley on April 23, 2004, to review the results of her MRIs. (Tr. 163). Dr. O'Malley opined that there were some changes at C4-5, but found no evidence of residual compression at that level or at any other. (*Id.*). Dr. O'Malley documented that Plaintiff's continued pain complaints "may be due to the Chiari and

may not." (*Id.*).  He discussed surgery options and risks with Plaintiff, and she stated "she had rather put up with the pain . . ., but it is something to keep in mind if the pain continues." (*Id.*).  Dr. O'Malley stated that he would continue to see Plaintiff as needed.  *Id.*

On June 1, 2004, Plaintiff saw Dr. O'Malley again still complaining of pain in her neck, shoulders and scapula area.  (Tr. 253).  Dr. O'Malley determined that her exam was benign, but because Plaintiff was still complaining of pain, he referred her to Pain Management.  (*Id.*).  Plaintiff stated she would like to proceed with the referral to Pain Management, but was concerned about taking narcotics.  (*Id.*).  Dr. O'Malley discussed non-narcotic options with Plaintiff.  (*Id.*).

During the same time frame Plaintiff was seeing Dr. O'Malley, she also saw Dr. Edwin Moyo.  (Tr. 240-42).  Plaintiff first saw Dr. Moyo on March 26, 2003, and during this initial visit he assessed that Plaintiff suffered from hypertension and cervical disc disease.  (*Id.*).  His notes indicate that Plaintiff was taking medication for depression, but that her neurological condition was "grossly okay." (*Id.*).

On April 2, 2003, Plaintiff was seen by Dr. Moyo for a follow-up appointment in relation to an Upper GI Endoscopy that had previously been conducted.  Test results revealed that Plaintiff had reflux esophagitis, gastritis, and mild duodenitis.  (Tr. 238).  Dr. Moyo continued to indicate that Plaintiff's neurological condition was "grossly ok." (*Id.*).

Dr. Moyo saw Plaintiff again May 5, 2003 with her chief complaint being a four-day history of melena.  (Tr. 235-37).  He believed she may have peptic ulcer disease, and admitted Plaintiff "to transfuse and stop the bleeding." (*Id.*).  Plaintiff was released from the hospital on May 7, 2003. On May 16, 2003, Plaintiff returned to see Dr. Moyo for a follow-up appointment for her upper GI problems.  (Tr. 230-32).  On July 21, 2003, Plaintiff returned to Dr. Moyo for a follow-up

appointment regarding her previous hospitalization. (Tr. 228-29). Dr. Moyo found that Plaintiff was doing well, yet noted "depression" under the neurological section.[1]  (*Id.*).  On October 6, 2003, Plaintiff began to complain of "chest wheezing," but Dr. Moyo found that her x-rays were normal. (Tr. 226-27).

The medical records show that Plaintiff's next visit with Dr. Moyo was not until April 26, 2004.  Plaintiff presented to this visit with a chief complaint of neck pain, but did have some abdominal pain as well. (Tr. 224-25).  Although her neurological status was documented as "grossly ok," Dr. Moyo assessed that Plaintiff was depressed.  (Tr. 225).  From the medical notes provided by Dr. Moyo, it does not appear that she was prescribed any medicine for pain, even though that was her chief complaint.  (*Id.*).  On May 26, 2004, Plaintiff saw Dr. Moyo again for pain, reporting pain in her neck, back and shoulder.  (Tr. 222-23).  At that visit, Dr. Moyo still did not prescribe any medicine for pain; instead he suggested Plaintiff take analgesics[2] and continue with her medications. (Tr. 222).  Interestingly, depression was not noted to be a problem at this visit, and Plaintiff's neurological condition was documented as "grossly okay" once again.  (*Id.*).

Contrary to the two previous visits, Plaintiff returned to Dr. Moyo's office on August 18, 2004 to be treated for heart burn.  (Tr. 220-21).  There is no mention of pain in relation to her last two visits documented during this consultation, but Dr. Moyo did recommend that Plaintiff discontinue alcohol use.  (*Id.*)  Additionally, there is no mention of depression by Dr. Moyo at this visit and her neurological condition was still considered "grossly okay."  (*Id.*).

---

[1]  Dr. Moyo began prescribing Klonopin at this visit.

[2]  Dr. Moyo did not prescribe any specific medication, which leads to the inference that he suggested Plaintiff take over-the-counter pain medication.  (Tr. 129, 222).

Again on September 1, 2004, Plaintiff saw Dr. Moyo complaining of coughing and chest congestion, but no mention of pain in her neck, back, or shoulder.  (Tr. 218-19).  Although Dr. Moyo referenced depression under the neuro/psychiatric section of his notes and in his assessment, he continued to consider Plaintiff's neurological condition as "grossly okay."  (*Id.*).  He also noted that Plaintiff was abusing cigarettes.  (*Id.*).

Contrary to Dr. Moyo's suggestion that Plaintiff quit smoking, she continued to do so, and came into his office on September 15, 2004 complaining of coughing.  (Tr. 216-17).  Dr. Moyo did not observe Plaintiff to be depressed, finding her neurological condition as "grossly okay."  (*Id.*).  Nor did Plaintiff make any complaints of pain.  (*Id.*).  Dr. Moyo continued to suggest that Plaintiff quit smoking, prescribed Nicoderm patches, and suggested that she return in one month.  (*Id.*).  Plaintiff returned on October 25, 2004 with no new complaints and no new problems; however, she was still continuing to smoke against the medical advice of Dr. Moyo.  (Tr. 214-15).  It should be noted that depression was not mentioned during this visit.  (*Id.*).

Plaintiff saw Dr. Moyo again on December 1, 2004 complaining of chest pains associated with shortness of breath.  (Tr. 213).  The next day Plaintiff was admitted to the hospital and was placed on bedrest.  (Tr. 203-11).  While there, Plaintiff had a cardiac catheter conducted by Dr. Vasudeva R. Goli.  (Tr. 207-11).  Dr. Goli determined that Plaintiff's arteries were clean, and she was discharged on December 3, 2004.  (Tr. 203).

The medical records show that Plaintiff returned to Dr. Moyo on June 20, 2005.  (Tr. 358).  The notes indicate that this visit was for right knee pain.  Plaintiff was given a prescription for Motrin.  (*Id.*).  Although Plaintiff was already taking Hydrocodone, a prescription which she had

filled six say prior, the pharmaceutical records show that Plaintiff filled her prescription with a generic form of Motrin on June 23, 2005.  (Tr. 125).

Plaintiff saw Dr. Moyo on August 26, 2005, still complaining of right knee pain.  (Tr. 356-57).  Although Plaintiff filled those prescriptions for pain prescribed by Dr. Moyo prior to this visit, there is no evidence in the record indicating that she saw Dr. Moyo for pain during the time in which the prescriptions were filled.  (Tr. 125, 356).

Dr. Moyo saw Plaintiff on September 2, 2005, when an MRI of her knee was conducted.  (Tr. 312).  The interpreting physician, Dr. Bryan Billions, found Chondromalcia[3] of the medial patellar facet, but otherwise, the MRI was unremarkable.  (*Id.*).  Dr. Moyo's notes indicate that Plaintiff came in on September 12, 2005 for the MRI results.  (Tr. 355).

On October, 18, 2005, Dr. Moyo opined that Plaintiff was suffering from anxiety, yet the notes state she went to his office because she was suffering from flu-like symptoms and elevated blood pressure.  (Tr. 354).  Plaintiff presented to Dr. Moyo again on December 1, 2005, with complaints that she was seeing black spots and experiencing headaches. (Tr. 353).  A CT scan was conducted on Plaintiff on December 15, 2005 at the request of Dr. Moyo.  (Tr. 311).  Dr. Clinton Walker Jr. interpreted the test, and Dr. Thomas Nelson Owens reviewed the results.  (*Id.*).  There is no indication that either doctor found anything adverse.  (*Id.*).  In fact, the "impression" section reads, "[n]o acute intracranial processes."  (*Id.*).

The next visit Plaintiff had with Dr. Moyo was not until June 28, 2006 when Plaintiff was complaining of pain in her right arm.  (Tr. 352).  Plaintiff continued to receive medication from Dr. Moyo.  (Tr. 123).  Plaintiff had a regular check-up with Dr. Moyo on August 15, 2006.  (Tr. 349).

---

[3] This condition is more commonly known as irritation of cartilage.

Dr. Moyo made no comments about pain, but did mark the "Joint Pain" box. (*Id.*). When Plaintiff returned on September 7, 2006, she complained of pain and it was noted that she had seen Dr. Jetty, who recommended that she undergo a sleep test to determine whether or not she suffered from sleep apnea. (Tr. 348).

On December 18, 2006, another MRI was conducted on Plaintiff's lower back. (Tr. 310). Dr. Wilton R. Holman III reviewed Plaintiff's test and determined there was a mild facet arthropathy at the lower three lumbar levels, but no stenosis or disc herniation was found. (*Id.*). On January 3, 2007, Dr. Moyo saw Plaintiff for back pain, but it was stated on the record that the results from Plaintiff's MRI were needed. (*Id.*). No further notes or medical records exist from Dr. Moyo.

While under the care of Dr. O'Malley and Dr. Moyo, Plaintiff also saw Dr. Thomas J. Kraus. (Tr. 247-59). Plaintiff was referred to Dr. Kraus for pain management by Dr. O'Malley on June 1, 2004. (Tr. 254). Dr. O'Malley informed Dr. Kraus that Plaintiff did not wish to use narcotics to treat her pain, and that he had discussed other non-narcotic treatments with her. (*Id.*). Nonetheless, on June 10, 2004, Plaintiff requested opiate therapy upon seeing Dr. Kraus. (Tr. 252). On September 21, 2004, Plaintiff saw Dr. Kraus for a follow-up visit. (Tr. 250). Dr. Kraus opined that Plaintiff's pain medications were doing well, and there did not appear to be any concern for abuse. (*Id.*).

Plaintiff went to Dr. Kraus's office again on December 13, 2004. (Tr. 248). In the notes from this visit, there are contradictory elements with regard to answers Plaintiff gave to questions concerning her pain. (*Id.*). For example, Plaintiff stated that her pain level range since her last appointment was a seven. (*Id.*). However, Plaintiff claimed the worst pain she experienced since her last visit was only five. (*Id.*). Furthermore, Plaintiff asserts that her pain level improved by fifty

percent since her last appointment. (*Id.*). Plaintiff stated that she believed the amount of pain relief she was receiving from her medication was enough to make a real difference in her life. (*Id.*). In the Progress Notes, dated the following day (December 14, 2004), it is documented that Plaintiff's pain medications were beneficial, yet her pain level was "same, unchanged." (Tr. 249). As evidenced by those notes, Plaintiff was asked if she was experiencing depression or anxiety; however, she reported that she was not and wanted to continue on the same medications. (*Id.*). Dr. Kraus saw Plaintiff again on March 8, 2005. (Tr. 247). At that visit, Dr. Kraus opined that Plaintiff would stay on the same medications and be seen again in three months. (*Id.*). Dr. Kraus observed that Plaintiff rated her pain level as six or seven, but would sporadically drop down to a level four. (*Id.*).

In addition to the visits mentioned above, Plaintiff saw Dr. Kraus seven more times from May 31, 2005 through August 1, 2006. (Tr. 288). However, no documentation exists in the record evidencing what transpired at these visits. (Tr. 247-54, 287-307). On August 15, 2006, Plaintiff had a Fluoroscopic Lumbar Epidural Injection ("FLEI"). (Tr. 289-300). Treatment notes indicate Plaintiff was allowed to go after the FLEI and was scheduled to return in three months. (Tr. 295, 300). Plaintiff returned to see Dr. Kraus on September 19, 2006, claiming she was suffering from pain in her back, leg, and hip, and that the FLEI did not help. (Tr. 307). However, notes from that visit do not explain treatment or recommendations concerning her claims. (*Id.*). Plaintiff was seen again by Dr. Kraus on January 9, 2007. (Tr. 306). The notes indicate that Plaintiff received no relief from her last procedure; however, the relief she received was an amount that was enough to make a real difference in her life. (*Id.*).

11

On April 3, 2007, Plaintiff visited Dr. Kraus still complaining of pain, but also said that the relief she was receiving from her medications was enough to make a real difference in her life. (Tr. 305).

Dr. Kraus saw Plaintiff on June 26, 2007. (Tr. 304). However, no comments were noted at this visit other than one indicating that Plaintiff was receiving an amount of relief from her medication that was making a real difference in her life. (*Id.*).

The last visit Plaintiff had with Dr. Kraus (at least that is found in the record) was on September 11, 2007. (Tr. 302-03). Interestingly, Dr. Kraus noted, "[o]verall, she is doing well." (Tr. 303). He did assess and determine that Plaintiff had a failed back surgery with a left radiculopathy. (*Id.*). For treatment, Dr. Kraus stated that he would continue Plaintiff's pain medications. (*Id.*). Plaintiff met with Dr. Kraus again on December 4, 2007. (Tr. 332). At that visit, Plaintiff reported her pain to be a level five, and treatment notes show that Dr. Kraus discussed with her that she should get her medications "only" from his office. (*Id.*). Included in this sequence of records is a Medical Source Opinion Form. (Tr. 330).[4]

In addition to being under the care of Dr.'s Moyo, O'Malley, and Kraus, Plaintiff also saw Dr. Praveen Jetty, a psychiatrist, on February 10, 2006. (Tr. 283-86). In his notes, Dr. Jetty reported

---

[4] To be sure, this is not the opinion of Dr. Kraus as it is misplaced in the record as evidenced by the "FAX" transmission date located in the top left-hand corner of the document, as well as the corresponding page number in the upper right-hand corner. (Tr. 330). The letter that accompanies this sequence of records is dated as received on February 11, 2008, which is entirely inconsistent with the fax transmission date atop the "Medical Source Opinion Form." (Tr. 329-30). Additionally, the form is unsigned and, thus, whomever completed the form is unknown. (Tr. 330). Moreover, the corresponding page number and date correlate with another document signed by Dr. Richard Azrin. (Tr. 338). No other medical records exist from Dr. Kraus, but pharmaceutical records demonstrate that Plaintiff continued to have prescriptions filled that were prescribed by him through December 11, 2007. (Tr. 121).

that Plaintiff felt depressed for the last three years, has anxiety while driving,[5] has difficulty focusing and concentrating, and cannot "deal with people." (Tr. 286). Additionally, Dr. Jetty indicated that Plaintiff had a plan of jumping out of a window or having an accident while driving. (Tr. 285). Dr. Jetty's notes regarding Plaintiff's "thought content" illustrates that Plaintiff demonstrated signs of low self-esteem, helplessness, extreme worry, but no suicidal ideas. (Tr. 284). Under Dr. Jetty's impression, he listed five axioms: (1) Monitor depression - severity high plus never diagnosed anxiety disorder; (2) Deferred; (3) Chronic neck pain, GERD, HTN, asthma; (4) "[n]o right to sue Taco Bell" because of two year statute of limitations; and (5) GAF 50. (Tr. 283). In order to treat Plaintiff, Dr. Jetty decided to discontinue her use of Xanax and Ativan, continue her prescription for Klonopin, and start her on Cymbalta in one week for two months. (*Id.*). Unfortunately, no other records exist to indicate whether or not Plaintiff saw Dr. Jetty at any other time. (Tr. 283-86).

On March 3, 2007, Plaintiff's medical records depict that she began to go to the Emergency Room at Cooper Green Hospital. (Tr. 321-23). She complained of right knee pain but denied any trauma. (Tr. 322). An X-ray was ordered for her right knee, but the results were negative. (Tr. 323, 327). Consequently, the treatment ordered for Plaintiff was that of an ace wrap. (Tr. 321). Plaintiff went to Cooper Green six more times from April 23, 2007 through November 20, 2007. (Tr. 314-20). Plaintiff's records indicated that she was seeing Dr. Robert Record after leaving Dr. Moyo's care because she lost her insurance. (Tr. 314, 317, 319-20). During that time, Plaintiff complained of lower back pain and knee pain, as well as a lesion on her thigh, the flu, need of an eye exam, and a sore throat. (Tr. 314-20). On April 23, 2007, X-rays were conducted on both knees, and it was

---

[5] Dr. Jetty noted that Plaintiff does drive, but since she has anxiety while doing so she has limited her driving to only a five mile radius of her home. (Tr. 286).

determined that only mild degenerative changes were seen.  (Tr. 319, 326).  Additionally, Plaintiff had a mammogram on May 5, 2007, which the results were negative.  (Tr. 325).  Dr. Record ordered a chest X-ray on November 20, 2007, but again, the results were negative.  (Tr. 324).  The pharmaceutical records indicate that in addition to the medications Plaintiff was receiving from Dr. Moyo and Dr. Kraus, she was also receiving medication from Dr. Record.  (Tr. 121, 135-37).  Interestingly, some of the medications are the same.  (*Id.*).

As a part of her request for DIB, Plaintiff saw Dr. John Dockery on July 9, 2005.  (Tr. 255).  Plaintiff claims she has help doing her hair and dressing, but can brush her teeth, use the bathroom without assistance, feed herself, bathe herself, and do some cleaning as pain allows.  (Tr. 255-56).  Dr. Dockery noted that Plaintiff denied headaches, depression, chest pains, and shortness of breath.  (Tr. 256).  Dr. Dockery also observed that Plaintiff was able to get on and off of the examination table without difficulty.  (Tr. 256-258).  Additionally, he noted she was able to take her shoes off and put them back on without difficulty.  (Tr. 258).  Dr. Dockery opined that there were no significant findings on physical examination other than complaints of muscle/myofascial pain in her neck, shoulder, and scapular musculature areas.  (*Id.*).  Additionally, he documented that Plaintiff had sensitivity at C6-T1 dermatones, which was inconsistent with her prior surgery.  (*Id.*).  Dr. Dockery determined that Plaintiff's subjective complaints exceeded the objective findings of his evaluation, and, therefore, there were no limitation of activities noted.  (*Id.*).  Moreover, he stated Plaintiff would have no postural, manipulative, or environmental limitations throughout an eight-hour workday.  (Tr. 259).

On August 4, 2005, Dr. Kenneth Warren conducted a psychiatric evaluation on Plaintiff as a part of her DIB application.  (Tr. 260-73).  He noted that Plaintiff suffers from depression.  (Tr.

263).  However, in the area of Functional Limitation,[6] Dr. Warren noted that Plaintiff's restrictions were mild for the first three criteria, and had no restrictions for the last one.  (Tr. 270).  Moreover, he determined that Plaintiff is not significantly functionally limited.  (Tr. 272).  Dr. Warren observed that Plaintiff's limitations stem from her physical allegations.  (*Id.*).  Therefore, he found that Plaintiff's statements were only partially credible.  (*Id.*).

Additionally, Plaintiff had a RFC evaluation conducted on August 4, 2005, as part of her DIB request.  (Tr. 274-81).  The RFC was completed by Brandi Hilson and her opinion differed from that of Dr. Dockery in that she found Plaintiff to be restricted in some areas that Dr. Dockery found Plaintiff was not.  (Tr. 280-81).  Specifically, Ms. Hilson found Plaintiff capable of occasionally lifting fifty pounds; frequently lifting twenty-five pounds; stand or walk for a total of six hours in an eight hour workday; sit a total of six hours in an eight hour workday; and pushing and pulling, but limited with the upper extremities.  (Tr. 275).  For postural limitations, Ms. Hilson noted that the only limitation Plaintiff had in this area was that she could only occasionally climb a ladder, rope, or scaffold.  (Tr. 276).  With regard to manipulative limitations, Ms. Hilson found that Plaintiff was limited in her ability to reach in all directions including overhead, but did not have any visual limitations.  (Tr. 277).  Additionally, Ms. Hilson noted that Plaintiff did not posses any communicative limitations.  (Tr. 278).

On January 21, 2008, Plaintiff met with Dr. John Neville for a psychological evaluation.  (Tr. 339-42).  Plaintiff was referred to this physician by her attorney because she was appealing her decision for DIB.  (Tr. 342).  Dr. Neville stated that Plaintiff was dysphoric, and he determined that

---

[6]  These include: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; (3) difficulties in maintaining concentration, persistence, or pace; and (4) episodes of decompensation, each of extended duration.  (Tr. 270).

Plaintiff's chronic pain and physical problems led to her depression and anxiety. (*Id.*). In turn, he felt that those problems have disrupted Plaintiff's intellectual functioning since her test results illustrate borderline range mild retardation. (*Id.*). As a result, Dr. Neville suggested that Plaintiff begin psychiatric treatment, psychotherapy, and pain management for treatment purposes. (*Id.*).

The ALJ ordered another psychological evaluation, which was conducted by Dr. Richard L. Azrin on March 6, 2008. (Tr. 333-38, 368-71). Dr. Azrin noted that Plaintiff was calm and quiet, and stated that Plaintiff's cognitive test results were quite poor, causing him to believe that Plaintiff was not putting forth her best effort. (Tr. 335-36). Dr. Azrin stated that Plaintiff's IQ did not match her history, and that her symptom reports seemed exaggerated. (Tr. 336). Consequently, he indicated that the severity of Plaintiff's condition was difficult to determine, and opined that "she probably has moderate to severe symptoms with anxiety symptoms being more prominent." (*Id.*). He further determined that Plaintiff may have some difficulty responding appropriately to supervisors and coworkers; however, he did believe that Plaintiff could carry out and remember instructions. (*Id.*).

## III.    ALJ Decision

Determination of disability under the Social Security Act requires a five step analysis. *See* 20 C.F.R. § 404.1 *et. seq.* First, the Commissioner determines whether the claimant is working. Second, the Commissioner determines whether the claimant has an impairment which prevents the performance of basic work activities. Third, the Commissioner determines whether claimant's impairment meets or equals an impairment listed in Appendix 1 of Part 404 of the Regulations. Fourth, the Commissioner determines whether the claimant's RFC can meet the physical and mental demands of past work. The claimant's RFC consists of what the claimant can do despite her

impairment.  Finally, the Commissioner determines whether the claimant's age, education, and past work experience prevent the performance of any other work.  In making a final determination, the Commissioner will use the Medical Vocational Guidelines in Appendix 2 of Part 404 of the Regulations when all of the claimant's vocational factors and RFC are the same as the criteria listed in the Appendix.  If the Commissioner finds that the claimant is disabled or not disabled at any step in this procedure, the Commissioner will not review the claim any further.

The court recognizes that "the ultimate burden of proving disability is on the claimant" and that the "claimant must establish a *prima facie* case by demonstrating that [s]he can no longer perform h[er] former employment."  *Freeman v. Schweiker*, 681 F.2d 727, 729 (11th Cir. 1982) (other citations omitted).  Once a claimant shows that she can no longer perform her past employment, "the burden then shifts to the [Commissioner] to establish that the claimant can perform other substantial gainful employment."  (*Id.*).

The ALJ found that Plaintiff did not suffer from a disability within the meaning of the Act from her alleged disability onset date of April 21, 2004 through the date of his August 4, 2008 decision.  (Tr. 20).  The ALJ determined that Plaintiff suffers from severe impairments of: degenerative disc disease of the cervical and lumbar spine; s/p anterior cervical diskectomy with fusion; obstructive sleep apnea; chronic obstructive pulmonary disease; obesity; depression; and anxiety.  (*Id.*).  However, the ALJ further concluded that Plaintiff did not have an impairment or combination of impairments that meet or medically equally one of the listed impairments found in 20 C.F.R. Pt. 404, Subpart P, Appendix 1of the Guidelines.  (Tr. 23).  According to the ALJ, Plaintiff's subjective pain complaints were not fully credible to the extent that they were inconsistent with the medical evidence contained in the record.  (Tr. 25).  The ALJ found that Plaintiff retains the

17

capacity to perform simple, noncomplex tasks, and to maintain attention and concentration during an eight-hour workday, provided that customary breaks are given. (Tr. 24). Nonetheless, the ALJ stated that Plaintiff is unable to perform past relevant work, but considering her age, education, work experience and RFC, there are jobs that exist in significant numbers in the national economy of which she could perform. (Tr. 30-31).

A Vocational Expert ("VE") was called by the ALJ to testify during the hearing. The VE stated that Plaintiff could perform the requirements of representative occupations such as cleaning, inspecting, sorting, collating, and some assembly jobs. (Tr. 31, 398-402). Furthermore, the VE testified that there is a significant number of these jobs which exist in North Central Alabama where Plaintiff resides. (*Id.*). Based on the VE's testimony, the ALJ found that a significant number of jobs exist in the regional and national economy that Plaintiff is capable of performing and that she was not under a disability, as defined in the Act, from her alleged onset date of disability through the date of his decision. (Tr. 31).

## IV.   Plaintiff's Arguments for Remand or Reversal

Plaintiff seeks to have the ALJ's decision, which became the final decision of the Commissioner following the expiration of the period for Plaintiff to file objections, vacated and/or reversed. (Doc. #10 at 10). Plaintiff claims that: (1) the ALJ's determination regarding Plaintiff's pain are against the weight of the evidence; and (2) the ALJ's findings concerning Plaintiff's mental RFC are not based on substantial evidence. (Doc. #10 at 5, 7).

## V.   Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## VI.    Discussion

In light of the legal standards that apply in this case, the court rejects Plaintiff's arguments for remand and/or reversal. For the reasons outlined below, the court finds that the ALJ's findings are supported by substantial evidence and that the ALJ applied the proper legal standards.

A.     **The ALJ Properly Evaluated Plaintiff's Pain Complaints in Determining that Those Complaints Were Not Credible**.

Plaintiff's first argument is that the ALJ erred by discrediting her pain testimony. (Doc. #10 at 10). Specifically, Plaintiff asserts that the ALJ's determination goes against the weight of the evidence. (*Id.*). The court finds, contrary to Plaintiff's assertions, that the ALJ's findings are supported by substantial and that he applied proper legal standards. (Tr. 24-30).

The Eleventh Circuit has established a three part pain standard that applies when a claimant asserts a disability through testimony of pain or other subjective symptoms. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). When a claimant alleges disability through subjective complaints of pain or other symptoms, the Eleventh Circuit's "pain standard" for evaluating these symptoms requires: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence that confirms the severity of the alleged pain or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain. *See Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002). The pain standard does not require objective proof of the pain itself. *Elam v. R.R. Ret. Bd.*, 921 F.2d. 1210, 1215 (11th Cir. 1991). However, the Act and its Regulations do require that a claimant produce objective medical evidence of a condition that reasonably could be expected to produce the kind of pain alleged; mere allegations of disabling pain are insufficient. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.929(b) (2006). Once such a medical condition is identified, a variety of factors are considered in evaluating the intensity and persistence of symptoms, such as pain, which would limit an individual's capacity for work, including daily activities, type and dosage of medication, treatment history, medical findings, and physicians' opinions. 20 C.F.R. § 416.929(c) (2006).

Under the Regulations, the initial inquiry involves whether a claimant's condition can cause the kind of pain alleged and does not entail any analysis of the severity, intensity, or persistence of the actual symptoms resulting from the medically documented condition. *See* 20 C.F.R. § 416.929(b) (2006). However, the inquiry does not end with the application of the pain standard. The Regulations set forth a secondary inquiry which evaluates the severity, intensity, and persistence of the pain and symptoms a claimant actually possesses. *See* 20 C.F.R. § 416.929(c)-(d) (2006). Indeed, there is a difference between meeting the judicially created pain standard and having *disabling* pain; meeting the pain standard is merely a threshold test to determine whether a claimant's subjective testimony should even be considered in order to determine the severity of that pain. *See* 20 C.F.R. § 416.929(b) (2006); *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992) ("The Secretary must consider a claimant's subjective testimony of pain if [the pain standard is met]."). After considering a claimant's complaints of pain, an ALJ "may reject them as not credible." *Marbury*, 957 F.2d at 839.

Although a reversal is warranted if the ALJ's decision contains no indication of the proper application of the three-part pain standard, *Holt v. Sullivan*, 921 F.2d. 1221, 1223 (11th Cir. 1991), the Eleventh Circuit has held that an ALJ's reference to 20 C.F.R. § 404.1529, along with a discussion of pain evidence, demonstrates the proper application of the pain standard. *Wilson*, 284 F.3d at 1225-26. In this case, the ALJ cited 20 C.F.R. § 404.1529 in his decision and discussed his reasons for finding that Plaintiff's allegations of disabling pain was not credible. (Tr. 24-30). Additionally, the ALJ found that the first part of the pain standard was met, but the second part was not. (Tr. 25). In his decision, the ALJ considered Plaintiff's numerous doctor visits between 2002 and 2008. (Tr. 24-30). The ALJ considered each one of her complaints and the resulting pain, and

gave reasons as to why he found that Plaintiff's complaints were not credible. (*Id.*). Specifically and in regards to her neck pain, the ALJ focused on the fact that Plaintiff reported that her pain had become more severe "out of the blue" than it was before she had surgery on her neck, even though the results of several MRI's revealed nothing remarkable. (Tr. 25). Yet, Plaintiff continued to complain of pain, and when one MRI on one part of her body revealed nothing, she began to complain of pain elsewhere. (Tr. 26). For example, when Plaintiff underwent pain management with Dr. Kraus in March 2005, she indicated that her pain in her neck had decreased to four from six/seven levels, but in July 2005, she told Dr. Dockery that her pain in her mid to lower back was an eight. (*Id.*). However, the pain Plaintiff was complaining of when she saw Dr. Dockery was inconsistent with her previous medical history. (*Id.*). Thus, the ALJ's decision to discredit Plaintiff's pain testimony is supported by substantial evidence.

Additionally, the Eleventh Circuit has stated that when a claimant makes complaints that are inconsistent with prior testimony of constant pain, that alone is substantial evidence for an ALJ to find subjective complaints of pain testimony not credible. *Shuhardt v. Astrue*, 303 Fed. App'x 757, 760 (11th Cir. 2008). The ALJ's decision clearly illustrates that at one point Plaintiff made claims of severe pain, but would make different claims at other instances. (Tr. 26). The ALJ found the record indicated several instances where Plaintiff claimed that the relief she was experiencing while seeing Dr. Kraus was enough to make a real difference in her life. (Tr. 27, 248, 304-05). Moreover, the ALJ found that Plaintiff consistently credited her medication and treatment with keeping her pain at levels that allow her to be functional. (Tr. 27). Thus, the ALJ's decision to find her complaints not credible was proper.

Moreover, the ALJ also considered other factors throughout the six years in which Plaintiff complained of pain. (Tr. 24-30). As time went on, Plaintiff saw multiple doctors, and on some occasions, saw two doctors in one day. (Tr. 27). The ALJ recognized that in some of these "same day" visits, Plaintiff would complain of pain, yet make no claims of pain with the second doctor. (*Id.*). At other times, Plaintiff would receive pain treatment for her alleged "severe pain," but then, be completely normal later that day at a second visit. (*Id.*). The ALJ clearly articulated each of these occurrences. (Tr. 26-27); *see Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Additionally, the ALJ reviewed the record which contained the results of multiple MRI's and X-ray's that were conducted on Plaintiff's neck, shoulder, back, and knees by different doctors, who never indicated any significant problems subsequent to her neck surgery. (Tr. 24-30). In light of the record, the ALJ concluded that Plaintiff's claims were exaggerated and inconsistent with the record as a whole. (Tr. 27); *see Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995). Again, the ALJ's determination properly discredited Plaintiff's pain complaints and is supported by substantial evidence.

**B.     The ALJ Properly Determined that Plaintiff Is Capable of Performing Various Occupations that Exist in Significant Numbers in the Regional and National Economy.**

Plaintiff's second argument is that the ALJ erred in finding that she can perform various occupations based upon the findings of her mental RFC. (Doc. #10 at 7). However, the ALJ never identified Plaintiff's mental RFC as the basis for his decision. (Tr. 24-30). The ALJ's decision regarding Plaintiff's mental capacity and ability to work was based upon her medical records, the opinions of different psychiatrists, and the testimony of the VE. (*Id.*). Specifically, in regards to Plaintiff's ability to work, the ALJ considered Plaintiff's age, education, work experience, and RFC. (Tr. 31). Moreover, the ALJ stated that he viewed those factors in association with the Medical

Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. (*Id.*). However, Plaintiff's brief gives guidance to resolve this issue.[7]

The responsibility for determining the RFC rests with the ALJ, 20 C.F.R. § 404.1546, and that assessment should be based upon all of the relevant evidence, including descriptions of limitations, observations of limitations by treating physicians, or family, or other persons, and other medical records. *See* 20 C.F.R. § 404.1545. The ALJ properly considered the medical records and the consulting physicians' opinions in reaching his decision. This is not a case where the ALJ "arbitrarily substitute[d] his own hunch or intuition for the diagnoses of a medical professional." *Marbury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1992) (Johnson, J., concurring). The opinion of a physician, even a treating physician, may be discounted when the opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if the opinion is inconsistent with the record as a whole. *See* 20 C.F.R. § 404.1527(d)(3)(2006); *Crawford v. Barnhart*, 363 F. 3d 1155, 1159-60 (11th Cir. 2004) (treating physician's report may be discounted when it is not accompanied by objective medical evidence or is wholly conclusory); *Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991). Also, medical opinions on the issues of disability or residual functional capacity are not entitled to any significant or controlling weight as those are issues reserved for the Commissioner. *See* 20 C.F.R. § 416.927(e) (2005).

There is substantial evidence that supports the ALJ's findings regarding Plaintiff's RFC. In regards to Plaintiff's mental capacity, the ALJ compared the different opinions and evaluations of

---

[7] Plaintiff's brief describes the different psychiatrist visits and different psychiatrist evaluations in regards to her mental capacity. (Doc. #10 at 7). In other words, Plaintiff's argument does not center upon a mental RFC; it does, however, concentrate on the opinions of the different health care professionals. (Doc. #10 at 7-10).

the psychologists in the record.  (Tr. 29-31).  The ALJ determined that prior to the denial of her application for disability, the medical records show that Plaintiff was taking Klonopin well before her injury, surgery, or alleged onset date.  (Tr. 28).  At that time, Plaintiff was working, and there is no indication that she was having problems coping with the conditions of a normal lifestyle.  The ALJ noted that according to the medical records, it was not until Plaintiff's application for DIB had been denied that she began complaining of panic attacks, yet there was no indication from Dr. Moyo's notes that he observed a level of depression or anxiety that Plaintiff described.  (Tr. 28, 355-57).  It is true that two different psychologists considered Plaintiff to have an IQ that would indicate that she was mildly retarded, but one of those psychologists stated that he believed that Plaintiff was putting forth poor effort.  (Tr. 29, 333-38).  The ALJ found the differing opinions significant in that they both supported the notion that Plaintiff was exaggerating her symptoms, particularly in light of the findings of both doctors that Plaintiff's cognitive functioning did not correlate with her work or educational history.  (Tr. 29, 333-42).

The ALJ found Plaintiff's pain testimony not credible and found her mental limitations exaggerated.  He concluded that Plaintiff did possess adequate skills to perform simple non-complex tasks.  (Tr. 23).  In combination with the VE's testimony, the ALJ found that Plaintiff could perform representative occupations such as cleaning, inspecting, sorting, collating, and some assembly jobs. (Tr. 31).  Thus, the ALJ determined that Plaintiff was capable of performing other work and was therefore found not disabled.  (*Id.*)

## VII.   Conclusion

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and proper legal standards were applied in reaching this determination.  The

Commissioner's final decision is therefore due to be affirmed, and a separate order in accordance with the memorandum of decision will be entered.

**DONE** and **ORDERED** this _____30th_____ day of August, 2010.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE